# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

JANICE LOWE,

    Plaintiff,

v.

CITY OF SEATTLE, et al.,

    Defendants.

CASE NO. CV07-0784-JCC

ORDER

This matter comes before the Court on Defendants' Motion for Summary Judgment (Dkt. No. 20), Plaintiff's Response (Dkt. No. 25), and Defendants' Reply (Dkt. No. 27).[1] Neither party has requested oral argument, and the Court finds the motion suitable for disposition on the briefing and supporting evidence submitted. For the reasons explained below, the Court hereby GRANTS Defendants' motion (Dkt. No. 20).

//

---

[1] Plaintiff's "Supplemental Response and Objection to New Arguments Supplied in the Reply Memorandum of Defendants" (Dkt. No. 30) was stricken for failing to comply with the Local Rules. (Minute Order Aug. 7, 2008 (Dkt. No. 31).) Defendants' Reply urges the Court to strike Plaintiff's Response as untimely, because although due on July 7, 2008, the brief was not filed until 11:07 a.m. on Tuesday, July 8, 2008. (*See* Dkt. No. 25.) Having considered Plaintiff's explanation for her tardiness (*see* Letter from Shahriza Ali (Dkt. No. 26)) and noting that Defendants do not claim to have been prejudiced by the delay, the Court DENIES Defendants' motion to strike.

ORDER – 1

## I. BACKGROUND

On the morning of July 16, 2004, Plaintiff Janice Lowe was at her mother, Gloria Dyer's, house, when she learned that her sister, Diane, had cancer. (*See* Lowe Decl. ¶ 3 (Dkt. No. 25 at 18).) Plaintiff became upset and Dyer and Plaintiff got into an argument, during which Plaintiff allegedly threw a plate at Dyer, injuring her face.[2] (Dyer Dep. 25:11–13, 28:22–24 (Dkt. No. 21 at 8, 11).) Before leaving Dyer's home, Plaintiff took some unidentified pills and said, "I might as well die." (Lowe Decl. ¶ 3 (Dkt. No. 25 at 18).) Then, she got in her gray pick-up truck and drove home.

Worried about her daughter, who has a long history of mental illness,[3] Dyer called 911. In response, Officer David Dunn of the Seattle Police Department ("SPD") was dispatched to Plaintiff's home address to check on a reported suicidal female and possible drug overdose. (Dunn Decl. ¶¶ 2–3 (Dkt. No. 22 at 1).) He arrived simultaneously with the Seattle Fire Department ("SFD") and contacted Plaintiff's sister, Sherri Leith, and Leith's husband Brad Currier, who were at the scene. Currier told Officer Dunn that Plaintiff had assaulted someone at her mother's address. (Incident Report 1–2 (Dkt. No. 22 at 8–9).)

Officer Dunn, concerned for Plaintiff's welfare, knocked loudly on her front door, identified himself as SPD, and asked her to allow himself and SFD to check on her welfare. (Dunn Decl. ¶ 5 (Dkt. No. 22 at 2).) Despite attempting to contact Plaintiff for several minutes, Officer Dunn received no response. (*Id.*) He told Plaintiff, through the door, that she had to come to the front door so that SPD and SFD could check on her, otherwise they would break the door down. (Incident Report 2 (Dkt. No. 9

---

[2] Plaintiff, while acknowledging that she "became very upset[,] . . . took some pills and . . . [said] I might as well die," makes no mention in her declaration of the argument with her mother, but denies assaulting her. (*See* Lowe Decl. ¶ 3 (Dkt. No. 25 at 18).) Whether or not Plaintiff actually assaulted Dyer, however, is immaterial to the Court's analysis. What is important is that Plaintiff was accused of doing so.

[3] Plaintiff reports that for more than ten years she has been living with, and been treated for, bi-polar disorder, obsessive compulsive disorder and manic depression. (Lowe Decl. ¶ 2 (Dkt. No. 25 at 18).)

ORDER – 2

at 30).) Officer Dunn stepped away from the door to inform a supervisor of his decision, at which time Plaintiff began to communicate with Leith through a side door. (*Id.*)

Shortly thereafter, Plaintiff exited her home and moved in the direction of her truck, which was parked behind her residence.[4] (Lowe Decl. ¶ 4 (Dkt. No. 25 at 18).) She was aware that there were several aid cars there, which she assumed had been called by her mother. (*Id.*; Lowe Dep. 66:5–19 (Dkt. No. 21 at 24).) She recalls hearing someone say, "hey, there she is," but admits that she did not try to determine who had said it, nor does she claim to have slowed or responded in any way. (Lowe Dep. 67:5–14 (Dkt. No. 21 at 25).) Plaintiff then got into her truck, and although several witnesses report that Officer Dunn commanded Plaintiff, in a loud, clear voice to get out of the vehicle (Taylor Decl. ¶ 5 (Dkt. No. 23 at 1); Baer Decl. ¶¶ 6–7 (Dkt. No. 24 at 2)), Plaintiff claims to have not heard him. It appeared to Officer Dunn and several other aid personnel present that Plaintiff was refusing to follow Officer Dunn's orders, that she may have even been trying to start her car, and after giving her warning, Officer Dunn broke the window and activated his Taser, stunning Plaintiff twice. (*See* Taylor Decl. ¶ 5 (Dkt. No. 23 at 1); Baer Decl. ¶ 7 (Dkt. No. 24 at 2).)

All agree that after Officer Dunn used the Taser, Plaintiff was compliant. She was treated immediately on the scene by aid personnel and then transported to Harborview. Plaintiff reports that she suffered some injuries from the broken window and that she still has scars from where the Taser darts struck her on her shoulder and her chest. (*See* Lowe Decl. ¶¶ 6–7 (Dkt. No. 25 at 19).) Plaintiff further reports that she was subject to a psychiatric evaluation at Harborview. She was then transferred to the King County Jail, where she spent fourteen days before the City Attorney moved to dismiss the charges against her. (*Id.* at ¶¶ 7–8.)

Through this action, Plaintiff asserts multiple state and federal claims against Defendants Officer

---

[4] Officer Dunn remembers Plaintiff running, shoeless, in a red dress, toward her truck (Dunn Decl. ¶ 6 (Dkt. No. 22 at 2)); Plaintiff denies running, but admits that "I did go to my truck." (Lowe Decl. ¶ 4 (Dkt. No. 25 at 18).)

ORDER – 3

Dunn and the City of Seattle, all arising out of the events of the morning of July 16, 2004. In the instant motion for summary judgment, Defendants move to dismiss Plaintiff's action in its entirety, arguing that the claims alleged are without merit or, in the alternative, that Defendants are entitled to qualified immunity. Plaintiff makes little effort to rebut the evidence that Defendants introduce, other than to argue that a material issue of fact exists because she claims to have not heard Officer Dunn's commands before he used the Taser.

**II. LEGAL STANDARD**

Plaintiffs' federal claims are brought pursuant to 42 U.S.C. § 1983, which provides a remedy to individuals whose constitutional rights have been violated by persons acting under color of state law. In order to obtain relief under § 1983, a plaintiff must show: "(1) a violation of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

Even where a plaintiff can show all four required elements, the defendants may be insulated from liability where they are entitled to qualified immunity. The defense of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Accordingly, "regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not 'clearly established' or the officer could have reasonably believed that his particular conduct was lawful." *Id*.

Ordinarily, when faced with a motion on summary judgment, the district court first considers whether material issues of fact are in dispute, but "when qualified immunity is at stake, a court must first determine whether the law has been clearly established." *Id*. at 628 (quoting *Tribble v. Gardner*, 860 F.2d 321, 324 (9th Cir. 1988)). Following the methodology established by the U.S. Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), courts first ask whether, based upon the facts taken in the light most

ORDER – 4

favorable to the plaintiff, the officer's conduct can be said to have violated a constitutional right. *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001) (citing *Saucier*, 533 U.S. at 199)). "If no constitutional right was violated, the court need not inquire further. If, however, a constitutional violation occurred, the second inquiry is whether the officer could nevertheless have reasonably but mistakenly believed that his or her conduct did not violate a clearly established constitutional right." *Id.* (citation omitted).

Assuming the court finds that the facts alleged support a finding that the officer's conduct violated a constitutional right, the plaintiff bears the burden of demonstrating that the right was clearly established at the time of its alleged violation. *Romero*, 931 F.2d at 627. If the plaintiff carries this burden, then the defendant must prove that a reasonable officer would have believed his conduct lawful under the clearly established principles of law governing that conduct. *See id*; *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1319 (9th Cir. 1995).

It is only at this stage that the court asks whether a genuine issue of material fact regarding the reasonableness of the officer's conduct precludes summary judgment. *Romero*, 931 F.2d at 628. Even in a § 1983 action, however, "[s]weeping conclusory allegations will not suffice to prevent summary judgment." *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1998). Plaintiff must do more than simply rely on the pleadings—she "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

### III. ANALYSIS

The parties present argument on two § 1983 claims, the first for unlawful arrest, and the second for excessive force, both asserted under the Fourth and Fourteenth Amendments to the United States Constitution.[5] Defendants contend that there existed probable cause to arrest Plaintiff and that Officer

---

[5] The Complaint makes its § 1983 allegations in a single sentence: "The acts and omissions of Defendants constituted the use of excessive force and violations of Plaintiff's 4th and 14th Amendment rights secured by the United States Constitution, in violation of 42 USCS [sic] § 1983." (Compl. ¶ III.5

ORDER – 5

Dunn used only the amount of force necessary to gain control of the situation.[6] In the alternative, Defendants argue that even if Officer Dunn was mistaken in his belief that probable cause existed or in the amount of force necessary to carry out his duties, he is entitled to qualified immunity.

The question of whether Officer Dunn is entitled to qualified immunity for allegedly falsely arresting Plaintiff without probable cause is "separate and distinct" from whether he is entitled to the same for any use of excessive force in effecting the arrest. *Alexander*, 64 F.3d at 1322. As such, each claim is addressed in turn, below.

**A.** *False Arrest*

Plaintiff claims that Defendants violated her "right to be free from unlawful arrest" (Pl.'s Resp. 5 (Dkt. No. 25)) and argues that summary judgment should be denied "[b]ecause she did not understand that she was being told to do anything by [Officer Dunn], . . . [she] could not have [committed

---

(Dkt. No. 3 at 9).) Even under the liberal pleading standards of the Federal Rules of Civil Procedure, to read this sentence as "plainly stating" an unlawful arrest claim would seem to be a stretch. *See* FED. R. CIV. P. 8(a)(2). However, as Defendants do not object to the discrepancy (wrongly, they object that "plaintiff has not alleged a federal *excessive force* claim" (Defs.' Mot. 9 (Dkt. No. 20)) (emphasis added), but make no similar charge about the wrongful arrest claim), the Court considers the parties' arguments on both.

[6] Defendants argue that Officer Dunn had probable cause to arrest Plaintiff for both assault and obstruction on the morning of July 16, 2004; however, the Court's review of the various papers filed in support of Defendants' motion indicate that, at the time Officer Dunn encountered Plaintiff at her home, Dyer had not yet reported the assault. When Officer Dunn arrived at Plaintiff's home, the most he could have known about the assault was information given to him by Currier, "that [Plaintiff] had also assaulted someone at the other address." (Incident Report 2 (Dkt. No. 22 at 9).) It was only after Plaintiff was transported to Harborview that Dyer confirmed that, during that morning's argument, Plaintiff had swept a plate in Dyer's direction, injuring her face. (*Id.*)

After Dyer confirmed the assault, the Court agrees that Defendants had probable cause to arrest Plaintiff on a domestic violence charge. Moreover, it would appear that under Washington's Domestic Violence Act, Defendants may have actually been *obligated* to arrest Plaintiff. *See, e.g.*, *Donaldson v. City of Seattle*, 831 P.2d 1098, 1103 (Wash. Ct. App. 1992) ("Generally, where an officer has legal grounds to make an arrest he has considerable discretion to do so. In regard to domestic violence, the rule is the reverse. If the officer has legal grounds to arrest pursuant to the statute, he has a mandatory duty to make the arrest.") However, the parties' briefing centers upon the basis for taking Plaintiff into custody at her home; thus, the Court's analysis considers only what Defendants demonstratively knew at that point in time.

ORDER – 6

obstruction]." (*Id.*) Citing nothing in support, Plaintiff summarily concludes:

> Beyond the issue of whether or not she obstructed the officer, or whether or not the police officer thought she was obstructing him, her description of what happened to her, involving destruction of private property, and personal injury, and psychiatric evaluation, and imprisonment, establish both injury and the absence of the protections of qualified immunity.

(*Id.*)

From the outset, Plaintiff offers little, if any evidence, that a constitutional violation occurred. Her claim is not well-defined, and it is difficult to determine what exactly—beyond the general accusation that she was "unlawfully arrested"—she alleges. In determining whether the law in question was clearly established, the Court must identify the "legal rule" at issue in a more specific manner than a vague "right to be free from unlawful arrest." *See Alexander*, 64 F.3d at 1319. Nothing in the record would appear to support a finding that there was not probable cause to arrest Plaintiff or that her arrest was otherwise "unlawful." Contrary to Plaintiff's assertion, the fact that the prosecutor elected not to pursue the charges against her does not suggest a finding that she was "not at fault" or that her arrest was unlawful. (*See* Lowe Decl. ¶ 8 (Dkt. No. 25 at 19).) In fact, the record indicates that the charges were dismissed *without prejudice* (Dkt. No. 21 at 29), which means that the City could refile them within the applicable statutes of limitations. *See, e.g.*, *In re Thompson*, 10 P.3d 380, 382 (Wash. 2000). It is simply wrong to argue that their dismissal can be read to imply a finding regarding Plaintiff's culpability or "an inferred admission of an improvident prosecution." (Pl.'s Resp. 6 (Dkt. No. 25).)

However, even assuming that Plaintiff could demonstrate, with particularity, that a constitutional right was violated and that right was clearly established at the time of its violation, Defendants present ample uncontroverted evidence that Officer Dunn could have reasonably believed that the arrest was lawful in light of clearly established law and the totality of the circumstances. Plaintiff's arguments about probable cause are beside the point. The qualified immunity analysis "looks not in terms of whether there was an arrest without probable cause," but rather whether Officer Dunn reasonably could have believed that arresting Plaintiff was lawful "in light of clearly established law and the totality of the circumstances."

ORDER – 7

*Alexander*, 64 F.3d at 1319; *see also Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1443 (9th Cir. 1991) ("The critical inquiry . . . is whether a reasonable police officer could have believed that his or her conduct was lawful, in light of clearly established law and the information he or she possessed at the time."). The analysis, therefore, is not focused on *Plaintiff*'s perspective of the events, but rather on the officer's objectively reasonable point of view.

The Court finds that Officer Dunn could have reasonably determined that he was justified in arresting Plaintiff for obstruction. "A person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties." WASH. REV. CODE § 9A.76.020(1). Plaintiff does not dispute that disobeying an officer's orders to exit the car and show her hands are sufficient grounds for an obstruction arrest. *See State v. Contreras*, 966 P.2d 915, 919–20 (Wash. Ct. App. 1998). Instead, Plaintiff argues that "[b]ecause she did not understand that she was being told to do anything by the officer, [she] could not have performed such a willful act." (Pl.'s Resp. 5 (Dkt. No. 25).) Whether Plaintiff's "action or inaction" was done "knowingly" is an essential element that the Government must prove in order to *convict* Plaintiff of obstruction, *Contreras*, 966 P.2d at 919, but it is not material to the qualified immunity analysis. Plaintiff admits that she saw numerous aid cars outside of her residence and that, when she left her home to go to her truck, she heard someone say, "hey, there she is." (Lowe Dep. 66:5–67:5 (Dkt. No. 21 at 24–25).) Moreover, at least two other witnesses attest that Officer Dunn did, in fact, clearly direct warnings and commands toward Plaintiff. (*See* Taylor Decl. ¶¶ 5, 7 (Dkt. No. 23 at 1, 2); Baer Decl. ¶ 6–7, 9 (Dkt. No. 24 at 2–3).) Plaintiff offers nothing to contradict this testimony and the issue, again, is not whether Plaintiff *actually* heard or understood the warnings, but whether Officer Dunn could have reasonably believed that she did, and was deliberately ignoring his commands. Plaintiff offers no evidence that would support a finding to the contrary.

For the foregoing reasons, the Court finds that Officer Dunn is entitled to qualified immunity with regards to Plaintiff's claim that she was "unlawfully arrested" in violation of the Fourth and Fourteenth

ORDER – 8

Amendments.

B. *Excessive Force*

Claims of excessive force in the context of arrests or investigatory stops are analyzed under the Fourth Amendment's "objective reasonableness" standard; they are "evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." *Saucier*, 533 U.S. at 204, 207 (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). Courts first determine whether, viewing the facts in the light most favorable to the plaintiff, the force used was objectively reasonable by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Jackson*, 268 F.3d at 651 (quoting *Graham*, 490 U.S. at 397).

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . [and the] calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396–97.

Here, the force at issue is Officer Dunn's decision to use his Taser to apprehend Plaintiff. By all accounts, Plaintiff was not seriously injured, and she received treatment both at the scene and at Harborview immediately after. Officer Dunn justifies his decision based, first, on his belief that Plaintiff posed an immediate threat to the safety of others and, second, on the fact that she appeared to be actively attempting to hinder the execution of his duties—in this instance, to contact Plaintiff, who had been accused of perpetrating an assault and was believed to have attempted suicide that very morning by overdosing. (*See* Dunn Decl. ¶ 7 (Dkt. No. 22 at 2–3) (discussing his "safety concerns for [Plaintiff] and the public if she drove, together with the reported drug overdose, suicide attempt and the report that she had possibly assaulted someone").)[7] In fact, Plaintiff's version of events does not raise any material issues

---

[7] Other aid personnel present at the scene echo Officer Dunn's concerns. Douglas Taylor, a firefighter with the Seattle Fire Department who was on the scene and treated Plaintiff immediately after

ORDER – 9

of fact on this point. Taking Plaintiff's version as true for purposes of summary judgment, she admits that she "was aware that there were a bunch of people who had come to my place," but apparently was uninterested in or unable to investigate who those people were. (*See* Lowe Decl. ¶ 4 (Dkt. No. 25 at 18).) She admits that she heard at least some of the commotion (e.g., a person calling out, "hey, there she is," when she exited her home and headed toward her truck), but that she did not stop or respond. (Lowe Dep. 67:5–14 (Dkt. No. 21 at 25).) She admits getting into her truck, and that earlier that morning she had taken "some pills" and had made statements that one might reasonably construe as a suicide threat ("I might as well die"). (Lowe Decl. ¶¶ 3, 4 (Dkt. No. 25 at 18).)

On balance, applying the *Graham* analysis, this Court concludes that the use of force was objectively reasonable under the circumstances. Two of the factors identified in *Graham* as central to the reasonableness analysis—whether the suspect posed an immediate threat to the safety of officers or others and whether the suspect was actively attempting to avoid legitimate contact by law enforcement—are present. *Graham*, 490 U.S. at 396. Although Plaintiff claims she could not have driven her car anywhere because aid cars were blocking her path, Officer Dunn had reason to believe that Plaintiff was not thinking clearly, and could have suspected that she might start the car anyway, and use it as a weapon. Plaintiff acknowledges that she had already that morning chosen to drive the car despite having taken "some pills." Moreover, Officer Dunn had no way of knowing whether Plaintiff had weapons in the vehicle. Finally, although the law does not require that the officer use the least invasive or intrusive alternatives available, "the availability of alternative means" can be relevant to the Court's analysis, and when Plaintiff got into her vehicle, the number of alternatives available for safely contacting her shrank. Plaintiff may argue that, had she heard Officer Dunn, she would have complied with his commands, but

---

she was Tasered, states, "Because of her reactions and the report we all had received on dispatch, Officer Dunn could not have let her drive away. Public safety concerns required that he prevent her from driving away." (Taylor Decl. ¶ 8 (Dkt. No. 23 at 2).) Sergeant Angela Gordon similarly stated, "Given the report of a drug overdose and the report of attempted suicide, I knew that she posed a public safety risk as a driver and could not be allowed to drive away onto city streets." (Gordon Decl. ¶ 4 (Dkt. No. 28 at 2).)

ORDER – 10

the standard explicitly makes "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. Applying that standard, the Court finds that no Fourth Amendment violation occurred here.

In light of this decision, the Court need not reach the second step of *Saucier*'s qualified immunity inquiry; however, were the Court to conclude that the record supported a claim that the force used was excessive, Plaintiff's excessive force claim could not survive the remainder of the analysis. It simply cannot be said that there was a clearly established rule that would prohibit using a Taser to subdue a suspected perpetrator of assault, who admittedly had taken pills that morning and made—at the very least—a veiled suicide threat, who appeared to be ignoring officers and aid personnel that had responded to her home, and who then appeared to be attempting to flee and drive under the influence. *See Saucier*, 533 U.S. at 208–09. Under these circumstances, a reasonable police officer could properly believe that the use of this level of force was necessary and would not violate a clearly established constitutional right.

//
//
//
//
//
//
//
//
//
//
//
//

ORDER – 11

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's § 1983 claims are DISMISSED. The Court declines to exercise supplemental jurisdiction over Plaintiff's related state law claims, and DISMISSES these as well. *See* 28 U.S.C. § 1367(c)(3). There being no matters left for this Court's decision, the Clerk of the Court is directed to close the case.

SO ORDERED this 29th day of August, 2008.

John C. Coughenour
United States District Judge

ORDER – 12